No. 134
The People &c.,
            Respondent,
        v.
Rhian Taylor,
            Appellant.

Joel B. Rudin, for appellant.
Sharon Y. Brodt, for respondent.

ABDUS-SALAAM, J.:

The dispositive issue on this appeal is whether a trial court abuses its discretion and commits reversible error when, in response to a request from a deliberating jury, it does not provide the jury with a substantial portion of requested evidence regarding the potential bias of key prosecution witnesses and

- 1 -

then suggests to the jury that there is no other evidence relevant to its inquiry.  Under the circumstances of this case, we hold that the trial court abused its discretion in taking such actions, necessitating reversal of defendant's convictions.

I.

Based on his alleged shooting of Wayne Peacock and Darion Brown, which resulted in Brown's death, defendant Rhian Taylor was indicted and tried on charges of murder in the second degree (see Penal Law § 125.25 [1]), attempted murder in the second degree (see Penal Law §§ 110.00; 125.25 [1]), assault in the first degree (see Penal Law § 120.10 [1]), assault in the second degree (see Penal Law § 120.05), reckless endangerment in the first degree (see Penal Law § 120.25) and two counts of criminal possession of a weapon in the second degree (see Penal Law §§ 265.03 [1] [b]; 265.03 [3]).  According to the People's proof at trial, the shooting occurred during a dispute outside the location of a party in Queens.

Specifically, on the night of August 10, 2007, Brown drove Peacock, as well as their friends Seprel Turner and Anthony Hilton, to the site of the festivities.  Upon their arrival and while they remained in the car, Brown tried to flirt with a friend of Hilton's, despite Hilton's admonition not to do so.  A man, whom Turner and Hilton later identified as defendant, purportedly took offense at Brown's actions and shot into the car, striking Brown repeatedly in the torso.  One shot also hit

Peacock, who immediately woke from a nap in the passenger seat and hence did not see the shooter's face.  Brown frantically drove away but soon hit a nearby pole, and he was knocked unconscious.  Peacock, Turner and Hilton scattered.  Turner and Hilton then met up at Turner's house.  About 10 minutes later, Hilton and Turner returned to the scene of the shooting, and although the police had already arrived, the men did not speak to the officers.  The officers retrieved Brown from the car, and he was rushed to the hospital, where he died.

Within a couple of days, Peacock led the police to Turner, who was shown a photo array and identified defendant as the shooter.  Acting on this identification, the police searched for defendant, who eventually surrendered.  On August 14, Turner identified defendant in a lineup.  Meanwhile, Hilton learned that the police were looking for him, and he decided to speak to them; in Hilton's telling, "[b]ecause they w[ere] riding around the neighborhood with [his] picture" and he was "going to court for a case," he "felt [he] had to take care of it."  Hilton informed the police of his observations of the crime, and he identified defendant in a photo array as the perpetrator.

Months later, in 2008, Hilton was arrested on unrelated charges.  Because Hilton was already on probation in connection with another criminal matter, he was charged with violating his probation.  When Hilton appeared in court to answer the specifications of a probation violation, the prosecutor who

handled the instant case also attended that court appearance and
requested that no bail be set in Hilton's case.  In August 2009,
Hilton pleaded guilty to the violation without any negotiated
plea.  The court returned Hilton to a five-year term of
probation.  While he continued serving his probation term, Hilton
shoplifted a scarf from a store, leading to his arrest and
eventual conviction on a charge of criminal possession of stolen
property.  Hilton also had prior convictions for menacing and
disorderly conduct.

        As for Turner, over a year after the shooting, in late
2009, he was arrested for unlawfully possessing a weapon.
Thereafter, the People and Turner negotiated a plea agreement,
under which Turner would plead guilty to criminal possession of a
weapon in the second degree, a felony, and to criminal possession
of a weapon in the fourth degree, a misdemeanor, and if he
testified truthfully at defendant's trial, the felony charge
would be dismissed and Turner could re-plead to the misdemeanor
charge, resulting in a purely probationary sentence.  On February
25, 2010, Turner pleaded guilty to the aforementioned charges and
executed a written cooperation agreement memorializing the
bargain.

        At trial, Turner acknowledged that he would obtain
other benefits as a natural consequence of the deal.  For
example, by receiving only a misdemeanor conviction, he could not
be sentenced as a second felony offender on any future crime that

he might commit.  And, Turner, who was pursuing a career as a rap artist, would avoid incarceration, thereby ensuring that he would not jeopardize his recently signed contract with a record label due to imprisonment.  As previously noted, Turner and Hilton were the only witnesses who identified defendant as the man who shot Brown and Peacock.

After the presentation of proof of the foregoing facts at trial, the parties presented their summation arguments.  In his summation, defense counsel argued that Hilton and Turner had been motivated to testify falsely against defendant, and in addition to the People's written cooperation agreement with Turner, counsel cited Turner's testimony about the additional benefits he would naturally receive from his plea and Hilton's testimony about the People's intervention at his probation hearing as proof of the witnesses' bias in favor of the People.  Counsel also argued that Hilton had a motive to kill Brown out of jealousy over Brown's flirtation with Hilton's friend, and counsel denounced Turner and Hilton as untrustworthy criminals whose testimony should be discounted.  In her summation, the prosecutor countered that the only material benefits which Turner had received were those set forth in the cooperation agreement, and she insisted that the People's advocacy for Hilton's release without bail in his case did not give Hilton a motive to testify favorably to the People in this case.

Prior to the start of the jury's deliberations, the

parties agreed that the court could submit any exhibits in evidence to the jury upon request without having to reconvene the parties and the jury in open court. The next day, the deliberations commenced, and before any proceedings occurred in open court, the jury issued three notes. The first note said, "We would like to see all the People's exhibits of the car, inside, outside and the scene in evidence collected." The second note said, "We would like to see two photo arrays. We would also like a sketch of the scene." The third note stated, "We would like a readback of Anthony Hilton's testimony and S. Turner's testimony with regard to their stories about being in the car prior to and up to just after the shooting." When proceedings resumed on the record, the court read the three notes to the parties and explained that the first two had already been "complied with pursuant to [the parties'] agreement." With respect to the third note requesting a readback of Hilton's and Turner's testimony, the court announced that it was ready to respond with the readback. The parties did not object to the court's responses to the notes, either as previously delivered or proposed, and the court had the testimony requested in the third note read to the jury.

The next day, prior to the start of proceedings on the record, the jury issued its fourth and fifth notes. The fourth note declared, "[W]e would like to see the benefits offered to Mr. Hilton and Mr. Turner, please." The fifth note stated, "We

would like to have definition of reasonable doubt."  In response to the fourth note asking to see the benefits offered to the witnesses, the court sent the jurors the written cooperation agreement between the People and Turner, without consulting the parties.  Thereafter, on the record, the court allowed the parties to inspect the two notes, and it read the contents of the notes aloud.

Defense counsel objected to the court's response to the fourth note.  Counsel essentially asserted that the response was incomplete without a readback of Turner's and Hilton's testimony about the benefits they had received outside the context of the written cooperation agreement, such as the career-related and sentencing benefits to Turner and the pretrial release obtained by Hilton in his probation matter.  The court replied that the jurors "didn't ask for that" and had "gotten the agreement," adding, "If they want anything more I'll be there to listen." When the court returned the jurors to the courtroom, it said, "I believe we sent in to you the cooperation agreement with Mr. Turner.  That's what is in evidence."  Next, the court proceeded to answer the fifth note, stated, "We will be here if you need anything," and sent the jurors back to the jury room.

Outside the presence of the jury, the court told defense counsel that its comments had accurately indicated to the jurors that they had received only an agreement between the People and Turner in response to their request and that they

could ask for additional materials if they so desired.  Referring to the court's statement to the jury about "what [was] in evidence," counsel responded by suggesting that this statement had been inaccurate because the written cooperation agreement did not represent the entirety of the evidence of the witnesses' benefits.  Counsel reiterated his belief that the jurors had wanted to receive all evidence of benefits conferred upon both witnesses, including the testimony about the benefits not memorialized in the cooperation agreement.  The court rejected counsel's arguments, deciding that the jurors' use of the term "see" in the fourth note revealed their desire to receive only evidence that could be visually inspected, i.e., the written cooperation agreement.

Following the contested fourth note, deliberations continued for just over two more days, and the jury issued, and the court answered, several more notes, including one stating that the jury was deadlocked.  Finally, on the fifth day of deliberations, the jury rendered a verdict convicting defendant of second-degree murder, second-degree assault, two counts of second-degree weapons possession and first-degree reckless endangerment.  After post-verdict proceedings not relevant to the disposition of this appeal, the court sentenced defendant to an aggregate prison term of 20 years to life, to be followed by five years of postrelease supervision, and defendant appealed.

The Appellate Division unanimously affirmed defendant's

convictions (see People v Taylor, 120 AD3d 842, 842-843 [2d Dept 2014]).  As relevant here, the Appellate Division rejected defendant's contention that the trial court had improperly responded to the fourth jury note by failing to read back Turner's and Hilton's testimony about the benefits they received in other cases based on their aid to the People in defendant's case (see id. at 842-843).  Essentially adopting the trial court's reasoning, the Appellate Division declared, "While it may have been preferable for the court to seek further clarification from the jury with respect to its request to 'see the benefits,' the wording of the subject jury note, particularly when read in conjunction with several other notes, demonstrated that the jury was requesting only the physical exhibit," and therefore the court's "response did not fall outside the acceptable bounds of its discretion, and thus satisfied the requirement of CPL 310.30" (id. [internal citations omitted]).  A Judge of this Court granted defendant leave to appeal, and we now reverse.

## II.

CPL 310.30 provides that, "[u]pon such request" for evidence or legal instruction from a deliberating jury, "the court must direct that the jury be returned to the courtroom and, after notice to both the people and counsel for the defendant, and in the presence of the defendant, must give such requested information or instruction as the court deems proper" (CPL 310.30).  Similarly, absent a withdrawal of the jury's inquiry or

similar circumstances, common-law principles of procedural fairness generally require the court to furnish the jury with information requested during its deliberations, and the court has significant discretion in determining the proper scope and nature of the response (see People v Gonzalez, 293 NY 259, 262-263 [1944] ["The general rule in the United States is that 'the court may and ordinarily should give the jurors additional instructions on their request.'"], quoting 23 C. J. S. Criminal Law, § 1376, subd. c., at 1046); see also People v Malloy, 55 NY2d 296, 302-303 [1982]).  Thus, regardless of whether the issue is framed under CPL 310.30 or common-law rules governing jury deliberations, where, as here, the defendant has preserved for our review a specific objection to the contents of the trial court's response to a jury note, we must determine whether the trial court acted within the bounds of its discretion in fashioning an answer to the jury's inquiry (see Malloy, 55 NY2d at 302; see also People v Cooke, 292 NY 185, 188 [1944] [noting that, under a pre-CPL 310.30 statute, which reflected to some extent the common law, not every refusal to answer the jury in a particular manner constituted reversible error]).  In determining whether the trial court abused its discretion and committed reversible error, "[t]he factors to be evaluated are the form of the jury's question, which may have to be clarified before it can be answered, the particular issue of which inquiry is made, the [information] actually given and the presence or absence of

prejudice to the defendant" (Malloy, 55 NY2d at 302; see People v Steinberg, 79 NY2d 673, 684 [1992]).

In this case, an evaluation of those factors demonstrates that the trial court abused its discretion by declining to provide the jurors with information that they plainly wanted and incorrectly characterizing the state of the evidence on the subject of their inquiry.  In that regard, the form of the jury's request in the fourth note showed that the jury wished to review all evidence of the benefits which Hilton and Turner acquired as a result of their assistance in the prosecution of defendant.  Because the jurors asked to see the benefits offered to "Mr. Hilton and Mr. Turner" (emphasis added), the form of their inquiry reflected their desire to examine the evidence of benefits conferred upon both witnesses, and that evidence necessarily included both the written cooperation agreement between the People and Turner and the witnesses' testimony about the advantages of their cooperation with the People.

Contrary to the trial court's supposition, the jury could not have desired exclusively to receive the written cooperation agreement, as that agreement did not provide any benefits to Hilton and simply memorialized a portion of the benefits received by Turner.  Given the jury's entreaty for all proof of Turner's and Hilton's gains related to their assistance in the prosecution of defendant, the court should have supplied

the jurors not only with the cooperation agreement, but also with: Turner's testimony that the cooperation agreement's provision for a non-prison sentence enabled him to keep a potentially lucrative recording deal; his testimony that his plea to a misdemeanor allowed him to avoid receiving a predicate felony offender adjudication on any future conviction; and Hilton's testimony that the trial prosecutor in defendant's case spared him from having to post bail in his probation proceeding.

Although, as the trial court noted, the jurors' expressed wish "to see" the pertinent evidence might have implied a desire solely to view an exhibit, this single phrase did not undermine the note's otherwise clear request for the entirety of the evidence of benefits conferred upon Turner and Hilton, especially in light of the context in which the note was issued. Notably, in their summations, both parties disputed the extent to which the written cooperation agreement and the witnesses' testimony on the subject of benefits reflected the witnesses' motives to testify in favor of the People, thereby drawing the jurors' attention to all of that evidence in a manner that would naturally prompt them to request that proof in its entirety. More importantly, prior to the issuance of the fourth note, the jurors had expressed their desire to visually inspect physical exhibits by specifically referring to particular physical objects, such as "photo arrays," "sketch[es]" or "exhibits," and therefore, had the jurors wanted to receive only the written

cooperation agreement in reply to their fourth note, they presumably would have asked to see "the agreement" or "the exhibit" setting forth the benefits to Turner. Instead, the jurors framed their request in terms of evidence of "the benefits" offered to the witnesses, period, without limiting the inquiry to an "exhibit" or physical object. Given the clear meaning of the note in context, the court improperly focused on the phrase "to see" in disregard of the remaining contents of the note and then proceeded to submit only the cooperation agreement to the jurors (cf. People v Lykes, 81 NY2d 767, 770 [1993] [approving the trial court's handling of a jury note in part because the court "did not limit or channel the jury's question"]). The court should have at least inquired as to whether the note in fact meant what its terms and the surrounding circumstances overwhelmingly suggested.

In addition, since the issue about which the jury inquired, namely the People's favorable treatment of Turner and Hilton, was essential to the jury's ability to judge the credibility of the sole witnesses to identify defendant as Brown's killer and Peacock's assailant, the court's inadequate response to the jury's query on that central issue further reflected the court's abuse of its discretion. Given the lack of any other testimony or physical evidence that defendant was the

shooter[1], Hilton's and Turner's credibility became the key issue at trial, and in light of the witnesses' respective criminal pasts, the truthfulness of their testimony was subject to serious dispute, calling for particular care in fashioning a fair and complete response to the jurors' inquiry into the matter.  In addition to the written cooperation agreement, the other evidence sought by the jurors had an especially strong bearing on the witnesses' credibility.  Indeed, because the requested testimony showed that the trial prosecutor had helped Hilton to win pretrial release in another case, this testimony suggested that Hilton had a motive to testify falsely in favor of the prosecution at defendant's trial out of gratitude for the prosecutor's aid.  Likewise, Turner's testimony that his cooperation with the People enabled him to avoid imprisonment, prevent future adverse sentencing adjudications and continue making a living showed that he had a motive to give false testimony against defendant in order to reap those rewards.  That being so, the court abused its discretion by withholding a highly significant portion of what the jury had asked for regarding an essential issue at trial (see generally People v Lourido, 70 NY2d 428, 435 [1987]; cf. People v Mercado, 91 NY2d 960, 963 [1998]).

Moreover, after the court failed to supply the jurors

---

[1]  Although defendant's DNA was found on a cigarette filter near several shell casings at the scene of the shooting, this evidence showed that defendant was in close proximity to the shooting and not that he was necessarily the shooter.

with the full extent of the requested evidence, the court made comments suggesting that the remainder of the sought-after proof did not exist, and the combination of the court's failure to give the jury necessary information and its inaccurate follow-up remarks prejudiced the defense.  Specifically, when the court told the jurors that the written cooperation agreement between the People and Turner was "what [was] in evidence" in relation to their note, the court incorrectly indicated that there was no evidence, other than the agreement, regarding benefits received by Hilton and Turner, even though testimony about such benefits did in fact exist.  Based on this statement, the jurors may have erroneously believed that either their recollection of the existence of such evidence was faulty or the testimony they had sought was irrelevant, prompting them to cease their inquiry into this important evidence based on false assumptions.  Since the People's proof of defendant's identity as the shooter was less than overwhelming and the court's response to the note seriously inadequate, the court abused its discretion as a matter of law, and reversal is required.

In reaching this conclusion, we do not signal any erosion of a trial court's discretion in answering jury notes. In acting within the bounds of discretion delineated by People v Malloy (55 NY2d at 296) and similar cases, a trial court retains leeway to shape its response to the jurors' inquiry based on the record as a whole and the applicable law, and if the court

entertains some doubt as to the meaning of a jury note, it can and should seek clarification from the jury (see Lykes, 81 NY2d at 769-770). Additionally, if some of the circumstances here were to arise in isolation in other cases, they might not support the conclusion that the trial court abused its discretion in answering a note, for no single factor is dispositive. Thus, we go no further than to hold that, under the totality of the circumstances in this case, the trial court abused its discretion as a matter of law by failing to adequately answer the jurors' fourth note and creating a false impression of the nature of the evidence.

### III.

Because defendant's challenge to the substance of the trial court's response to the jury's fourth note mandates reversal of his convictions, we need not decide whether the court committed a mode of proceedings error by revealing the contents of the fourth note to the parties only after it had sent the cooperation agreement to the jury, and we express no opinion on that matter. For the same reason, we need not address defendant's remaining contentions. Accordingly, the order of the Appellate Division should be reversed and a new trial ordered.

People v Rhian Taylor

No. 134

RIVERA, J.(concurring):

I concur in the result only, and agree with the majority that defendant's convictions must be reversed, but on different grounds. Moreover, because I find the majority's analysis an unnecessary and overly broad reading of our case law on the proper handling of jury requests, I decline to join its interpretation of the legal requirements set by this Court in this area.

In People v O'Rama (78 NY2d 270, 276-277 [1991]), this Court held that CPL 310.30 imposes on a court the duty to notify counsel of a substantive juror inquiry, and the duty to meaningfully respond to the jury. In accordance with our interpretation of CPL 310.30, an utter failure to respond cannot be termed "meaningful" in any sense of the word (see People v Lourido, 70 NY2d 428, 435 [1987]). Furthermore, we recently reaffirmed in People v Walston (23 NY3d 986, 989 [2014]) that fulfillment of these duties is a core responsibility of the trial court. Thus, the court's failure to fulfil these responsibilities constitutes a mode of proceedings error, which does not require preservation (id.; People v Alcide, 21 NY3d 687, 692 [2013] [a mode of proceedings error will result where a judge

- 1 -

fails to afford meaningful response to the jury]).  This error

also requires reversal and a new trial (People v Roberites, 115

AD3d 1291, 1293 [2014] [court's failure to provide notice to

counsel constituted a mode of proceedings error which requires

reversal and a new trial]).

       As the majority correctly describes, the jury note

expressed the jurors' desire to review the evidence of the

benefits accorded to Anthony Hilton and Seprel Turner, which

obliged the court to provide evidence relating to both

witnesses.*  However, the court failed to provide any information

at all regarding the benefits granted to Hilton, notwithstanding

the existence of testimony in the record readily available to

address such a request.  Thus, on the facts of this case, the

---

*The fact that the inquiries were included in one jury note
is irrelevant for purposes of the analysis because a court's duty
to provide a meaningful response for each request remains
unchanged, and a complete failure to reply to any inquiry is
error (see People v Stocks, 101 AD3d 1049, 1051 [2d Dept 2012]
[finding O'Rama violation where court failed to provide defense
counsel with notice of jury note, which contained, in part, a
substantive request]; see also People v Brown, 125 AD3d 1550 [4th
Dept 2015] [treating one note with multiple requests as separate
inquiries and finding no O'Rama violation where defense counsel
participated in the formulation of a response to the factual
inquiries, and did not preserve for review the court's response
to the part of the note concerning the readback of testimony];
People v Jackson, 105 AD3d 607 [1st Dept 2013] [finding no
violation but analyzing different parts of one note separately]).

Court's response to the jury's request to review information

relating to Hilton was no response at all, and as such

constituted a mode of proceedings error under our O'Rama

jurisprudence.  That error requires reversal and, therefore,

there is no need to consider, as the majority does, whether

Supreme Court abused its discretion.

*    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

Order reversed and a new trial ordered.  Opinion by Judge Abdus-
Salaam.  Judges Pigott, Stein and Fahey concur.  Judge Rivera
concurs in result in a separate opinion in which Chief Judge
Lippman concurs.

Decided October 27, 2015